UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PATRICK MCNAMARA, | ) | Case No. 11-cv-2137-L(WVG) |
| Plaintiff, | ) ) | **ORDER:** |
| v. | ) ) | **(1) GRANTING DEFENDANTS'** |
| ROYAL BANK OF SCOTLAND | ) ) | **MOTION TO COMPEL ARBITRATION [DOC. 41]; AND** |
| GROUP, PLC; *et al.*, | ) | **(2) DISMISSING WITHOUT** |
| Defendants. | ) ) | **PREJUDICE THIS ACTION** |

Pending before the Court is Defendants Royal Bank of Scotland Group, PLC ("RBS"), Citizens Financial Group, Inc., doing business as RBS Citizens N.A. ("Citizens"), and The Kroger Company ("Kroger")'s motion to compel Plaintiff Patrick McNamara's claims for alleged violations of the Telephone Consumer Protection Act ("TCPA") to arbitration and to stay the case pending the outcome of that arbitration.[1]  Plaintiff opposes.

The Court found this motion suitable for determination on the papers submitted and without oral argument.  *See* Civ. L.R. 7.1(d.1).  (Doc. 45.)  For the following reasons, the Court **GRANTS** Defendants' motion to compel arbitration and **DISMISSES WITHOUT PREJUDICE** this action in its entirety.

//

---

[1] Royal Bank of Scotland Group has since been dismissed from this case.  (Doc. 51.)

## I.   BACKGROUND

Plaintiff is a resident of San Diego, California.  (Compl. ¶ 2.)  RBS is in the business of issuing consumer credit cards to residents of the United States.  (*Id.* ¶ 3.)  Citizens is a wholly owned subsidiary of RBS.  (*Id.* ¶ 4.)  Kroger is the largest retail supermarket chain the United States.  (*Id.* ¶ 5.)  Kroger and RBS conducted a joint business venture to issue credit cards to consumers under the name "Kroger Personal Finance."  (*Id.* ¶ 6.)

On or about July 21, 2007, Plaintiff applied for a credit-card account via telephone with Citizens under the Kroger Personal Finance program.  (Klos Decl. ¶¶ 3–4; McNamara Decl. ¶ 3.) After his account was opened, Citizens mailed Plaintiff his credit card along with a Credit Card Agreement ("Agreement").  (Klos Decl. ¶ 5.)  Section 2 of the Agreement provides:

> You agree to the terms of this Agreement, as it may be amended from time to time, when you obtain credit . . . .  By using your Account, or by signing any charge slip drawn on your Account . . . you will be confirming that you agree to the terms of this Agreement, as amended from time to time.

(Klos Decl. Ex. A.)  Sometime thereafter, under Section 2 of the Agreement, Citizens amended the Agreement ("Amended Agreement") with the following arbitration provisions:

> UNDER THESE ARBITRATION PROVISIONS, YOU WAIVE RIGHTS TO LITIGATE CLAIMS IN COURT BEFORE A JUDGE OR JURY AND WAIVE YOUR RIGHTS TO BRING OR PARTICIPATE IN CLASS ACTION LAWSUITS. OTHER RIGHTS YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.
>
> Under these Arbitration Provisions, either you or the Bank may elect that any claim, dispute or controversy of any nature (a "Claim") under or related to any Account you have with the Bank (including claims related to advertisements, other solicitations, any benefits or services related to your Account, any credit application to the Bank or any servicing and collection activity and the 1-2-3 REWARDS® Program including any claims regarding applicability of these Arbitration Provisions) brought by either you or the Bank against the other or against Kroger Personal Finance® or any affiliate thereof, their successors or assigns (each a "party"), be resolved by binding arbitration under the National Arbitration Forum ("NAF"), under the Code of Procedure then in effect.  If NAF is unable to serve as arbitrator, the American Arbitration Association will be used in place of NAF.  Any party may elect arbitration at any time, unless a final judgment on the Claim has been entered by a Court.
>
> An Arbitrator can only consider your Claim as an individual and not as a representative of others, and you may not bring an action as a private

11cv2137

attorney general or join the claims of other people who may have similar claims (and you may not bring or participate in a class action claim or serve as a private attorney general. Only a court of competent jurisdiction may determine the validity and effect of the preceding sentence.) Any arbitration hearing will take place in the Federal judicial district where you live, unless you and the Bank agree otherwise. The award of the arbitrator will be in writing and may be enforced in any court with jurisdiction over the parties.

. . . .

THE RESULT OF THESE ARBITRATION PROVISIONS IS THAT, EXCEPT AS PROVIDED ABOVE, CLAIMS CANNOT BE LITIGATED IN COURT INCLUDING SOME CLAIMS THAT COULD HAVE BEEN TRIED BEFORE A JURY AS CLASS ACTIONS OR AS PRIVATE ATTORNEY GENERAL ACTIONS.

(Klos Decl. ¶ 7 (citing Klos Decl. Ex. A) (capitalization in original).) Section 20 of the

Amended Agreement also includes a choice-of-law provision that indicates that federal and

Connecticut laws govern the Agreement. (Klos Decl. Ex. A.)

Once his account was opened, Plaintiff asked for a balance transfer in the amount of

$10,000.00. (McNamara Decl. ¶ 3.) To the best of his recollection, Plaintiff never used the

account to make purchases and did not use any of the cash-advance checks. (*Id.* ¶ 6.) Aside

from the initial balance transfer, Plaintiff did not use the credit extended to him. (*Id.*)

In early September 2009, he received a notice that his credit limit was being reduced due

to a drop in his credit score, even though he had never missed a payment until then. (McNamara

¶ 11.) However, Plaintiff eventually missed his first payment that was due in early October

2009. (*Id.* ¶ 12.) Even though Plaintiff never gave permission to call his cellular phone,

Citizens began calling his cellular phone regarding his credit card. (*Id.* ¶¶ 12–13.) Plaintiff

alleges that many of these phone calls used an artificial or pre-recorded voice to leave messages

or give instructions. (Compl. ¶ 8.) In total, Plaintiff received 22 calls to his cellular phone

relating to the credit card. (McNamara Decl. ¶ 16.)

On September 15, 2011, Plaintiff commenced this action in this Court, alleging that

Defendants violated the TCPA, 47 U.S.C. § 227, by negligently, knowingly, and willfully

contacting Plaintiff on his cellular telephone without his express prior consent. Specifically,

Plaintiff asserts two claims under the TCPA: (1) Negligent Violations of the TCPA, and (2)

Knowing or Willful Violations of the TCPA. Defendants now move to compel arbitration of the

3

11cv2137

1  claims asserted in the complaint and stay of this case pending the outcome of that arbitration.

2  Plaintiff opposes.

3

4  **II.   LEGAL STANDARD**

5        The Federal Arbitration Act ("FAA") governs disputes involving contracts that touch

6  upon interstate commerce or maritime law.  9 U.S.C. §§ 1, *et seq*.  The FAA preempts state law

7  where the validity of an arbitration clause is disputed.  *See Moses H. Cone Mem'l Hosp. v.*

8  *Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).  It also "embodies a clear federal policy in favor

9  of arbitration."  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999)

10       "The standard for demonstrating arbitrability is not high."  *Simula*, 175 F.3d at 719.  The

11  district court can only determine whether an agreement to arbitrate exists, and if so, to enforce it

12  in accordance with its terms.  *Id.* at 720 (citing *Howard Elec. & Mech. v. Briscoe Co.*, 754 F.2d

13  847, 849 (9th Cir. 1985)).  In other words, the FAA "leaves no place for the exercise of

14  discretion by a district court, but instead mandates that district courts *shall* direct the parties to

15  proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean*

16  *Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

17       To determine whether parties have agreed to arbitrate a dispute, courts apply general

18  state-law principles of contract interpretation.  *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042,

19  1044 (9th Cir. 2009).  Once an agreement to arbitrate is found to exist, "[the FAA] establishes

20  that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be

21  resolved in favor of arbitration, whether the problem at hand is construction of the contract

22  language itself or an allegation of waiver, delay, or a like defense to arbitrability."  *Moses H.*

23  *Cone Mem'l Hosp.*, 460 U.S. at 24-25; *see also Quakenbush v. Allstate Ins. Co.*, 121 F.3d 1372,

24  1380 (9th Cir. 1997).  Enforcement of an arbitration agreement "should not be denied unless it

25  can be said with positive assurance that the arbitration clause is not susceptible of an

26  interpretation that covers the asserted dispute."  *AT&T Tech., Inc. v. Commc'n Workers,* 475

27  U.S. 643, 650 (1986); *see also United Food and Comm. Workers Union v. Geldin Meat Co.*, 13

28  F.3d 1365, 1368 (9th Cir. 1993) ("Doubts should be resolved in favor of coverage.").  Thus, to

11cv2137

1    determine whether this case must be submitted to arbitration, the Court must limit its inquiry to:

2    (1) whether a valid agreement to arbitrate exists, and if it does, (2) whether the dispute falls

3    within the scope of the agreement to arbitrate.  *See Chiron Corp. v. Ortho Diagnostic Sys.*, 207

4    F.3d 1126, 1130 (9th Cir. 2000).

5

6    **III.    DISCUSSION**

7           **A.    Choice of Law**

8           "In determining the validity of an agreement to arbitrate, federal courts 'should apply

9    ordinary state-law principles governing formation of contracts.'"  *Ferguson v. Countrywide*

10   *Credit Indus., Inc.*, 298 F.3d 778, 782 (9th Cir. 2002) (quoting *First Options of Chicago, Inc. v.*

11   *Kaplan*, 514 U.S. 938, 944 (1995)).  However, "[b]efore a federal court may apply state-law

12   principles to determine the validity of an arbitration agreement, it must determine which state's

13   laws to apply."  *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 994 (9th Cir. 2010).  "It makes this

14   determination using choice-of-law rules of the forum state."  *Id.*  In this case, the forum state is

15   California.

16          When the parties have an agreement that another jurisdiction's law will govern their

17   disputes, the Ninth Circuit instructs that the appropriate analysis for the trial court to undertake is

18   set forth in *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992), which addresses the

19   enforceability of contractual choice-of-law provisions.  *Wash. Mut. Bank, FA v. Superior Court*,

20   24 Cal. 4th 906, 914-15 (2001); *see also Pokorny*, 601 F.3d at 994.  Under *Nedlloyd*, the court

21   must first determine either: "(1) whether the chosen state has a substantial relationship to the

22   parties or their transaction, or (2) whether there is any other reasonable basis for the parties'

23   choice of law."  3 Cal. 4th at 466.  "If neither of these tests is met, that is the end of the inquiry,

24   and the court need not enforce the parties' choice of law."  *Id.*  "If, however, either test is met,

25   the court must next determine whether California has a 'materially greater interest than the

26   chosen state in the determination of the particular issue[.]'"  *Id.*  "If California has a materially

27   greater interest than the chosen state, the choice of law shall not be enforced."  *Id.*

28   //

11cv2137

1    Section 20 of the Amended Agreement contains a choice-of-law provision that states that

2    the "Agreement and the use of [the] Account are governed by, and interpreted under, Federal

3    law . . . including the United States Arbitration Act, and to the extent not governed or preempted

4    by Federal law, by the laws of the State of Connecticut applicable to contracts made and to be

5    performed therein without reference to principles of conflict of laws."[2]  (Klos Decl. Ex. B.)

6    Both parties apply Connecticut law when addressing unconscionability, but not when addressing

7    waiver.  Rather, the parties apply California law in their waiver analyses.  More importantly,

8    neither party addresses the choice-of-law issue, and both parties failed to notice the

9    inconsistency of addressing the unconscionability defense under Connecticut law, but the waiver

10   defense under California law despite the existence of the choice-of-law provision in the

11   Agreement.  *See, e.g., Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1124 n.7 (9th Cir. 2008)

12   (rejecting the application of a waiver test articulated in a case because, after tracing its lineage,

13   that case's test was found not to be based on California law); *see also Moses H. Cone Mem'l*

14   *Hosp.*, 460 U.S. at 24-25.

15       After applying the *Nedlloyd* choice-of-law analysis, it appears that the choice-of-law

16   provision in the Agreement is unenforceable.  *See Nedlloyd*, 3 Cal. 4th at 466.  Based on the

17   allegations in the complaint, none of the parties have any connection to Connecticut, and the

18   transaction in question entirely took place in California.  In fact, "Connecticut" literally does not

19   appear anywhere in the complaint.  Also, there is no apparent reasonable basis for the choice of

20   law based on the allegations in the complaint or anything else provided by the parties.  Because

21   the parties fail to meet either test, the choice-of-law inquiry ends and the court need not enforce

22   the parties' choice of law.  *See id.*  Though it appears that the Agreement's choice-of-law

23   provision may be unenforceable, the Court will nonetheless apply California law to the waiver

24   analysis and Connecticut law to the unconscionability analysis below, just as the parties do in

25   their moving papers.

26

27       [2] Neither party provides a legible copy of the Agreement, which forced the Court to refer
28   to the Amended Agreement instead.

6

11cv2137

**B.    Defendants Did Not Waive Their Right to Arbitrate.**

"The right to arbitration, like any other contract right, can be waived." *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 921 (9th Cir. 2009). "[W]aiver of the right to arbitration is disfavored because it is a contractual right, and thus any party arguing waiver of arbitration bears a heavy burden of proof." *Id.* (internal quotation marks omitted). "Generally, the determination of waiver is a question of fact." *Saint Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal. 4th 1187, 1196 (2003).

> In determining waiver, a court can consider (1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place; and (6) whether the delay affected, misled, or prejudiced the opposing party.

*Id.* (internal quotation marks omitted) (brackets in original); *see also Cox*, 533 F.3d at 1124.[3] The California Supreme Court has stressed the "significance of the presence or absence of prejudice." *Christensen v. Dewor Devs.*, 33 Cal. 3d 778, 782 (1983) (quoting *Doers v. Golden Gate Bridge, Highway & Transp. Dist.*, 23 Cal. 3d 180, 188 (1979)).

In April 2011, Plaintiff filed a complaint against Defendants in the San Diego Superior Court. (Ankcorn Decl. ¶ 9.) He alleged claims for violations of the Rosenthal Fair Debt Collection Practices Act and the TCPA, and for invasion of privacy by intrusion upon seclusion. (Ankcorn Decl. Ex. B.) Citizens and Kroger filed an answer, and Citizens independently filed a

---

[3] The Ninth Circuit noted in *Cox* that the state-law lineage of a waiver test is an important consideration, suggesting that the basis of the waiver defense should be rooted in the same state's laws as the other defenses to arbitration. *Cox*, 533 F.3d at 1124 n.7. Defendants apply a different three-factor test for waiver articulated in *Park Place*. (Defs.' Reply 1:15–19.) However, upon closer inspection, that test is not based on California law, but rather primarily based on Second Circuit law. *See Park Place*, 563 F.3d at 921 (citing *Fisher v. A.G. Becker Paribas Inc.*, 791 F.2d 691, 694 (9th Cir. 1986)); *Shinto Shipping Co., Ltd. v. Fibrex & Shipping Co., Inc.*, 572 F.2d 1328, 1330 (9th Cir. 1978) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 516-17 (1974) (arising from Illinois); *Erving v. Va. Squires Basketball Club*, 468 F.2d 1064, 1068 (2d Cir. 1972) (arising from New York)).

11cv2137

1   cross-complaint against Plaintiff seeking, among other things, the sum of the debt Plaintiff

2   owed.  (Ankcorn Decl. Exs. D, E.)  Though the parties engaged in discovery, Defendants note

3   that "no depositions occurred and no dispositive briefs were filed . . . [and] Plaintiff produced

4   fewer than 60 pages of documents." (Ankcorn Decl. ¶¶ 22–47; Sullivan Decl. ¶ 8.)  The parties

5   eventually settled the state action, but not before Plaintiff voluntarily dismissed his TCPA claim,

6   which is now the basis of the action currently before this Court.  (Ankcorn Decl. ¶ 58; Sullivan

7   Decl. ¶ 2–7.)  Plaintiff argues that Defendants waived their right to arbitration based on their

8   actions in the state action with each of the *Saint Agnes* factors weighing in his favor.

9          "Waiver does not occur by mere participation in litigation; there must be 'judicial

10  *litigation* of the merits of arbitrable issues,' although 'waiver could occur prior to a judgment on

11  the merits if prejudice could be demonstrated.'"  *Keating v. Super. Ct.*, 31 Cal. 3d 584, 607

12  (1982) (quoting *Doers*, 23 Cal. 3d at 188) (internal citations omitted).  "Prejudice in the context

13  of wavier of the right to compel arbitration normally means some impairment of the other party's

14  ability to participate in arbitration."  *Groom v. Health Net*, 82 Cal. App. 4th 1189, 1197 (2000).

15  Indeed, the mere expense of responding to motions or other preliminary pleadings filed in court

16  is not the type of prejudice that bars a belated petition to compel arbitration.  *See id.*  Thus,

17  insofar as Defendants' participation in defending themselves in the state action initiated by

18  Plaintiff that has since been settled and dismissed, Plaintiff fails to overcome the heavy burden

19  of proof needed to show waiver of arbitration.[4]

20         Moving on to the consequences of the discovery conducted in the state action, "courts

21  have found prejudice where the petitioning party used the judicial discovery process to gain

22  information about the other side's case that could not have been gained in arbitration." *Saint*

23  *Agnes*, 31 Cal. 4th at 1203.  In *Berman v. Health Net*, 80 Cal. App. 4th 1359 (2000), the court

24  affirmed a finding of waiver based on the prejudice that the opposing party suffered as a result of

25

26         _____

27         [4] Plaintiff argues that Defendants acted inconsistently with the right of arbitration based
        on a statement that they made in a motion to dismiss filed in this Court but was withdrawn three
        days later.  The Court rejects this argument because it is based on a statement in a motion that

28      was properly withdraw, thereby also withdrawing that statement.

8

1   complying with "extensive discovery requests." *Berman*, 80 Cal. App. 4th at 1362.  However, in

2   this case, Defendants served the following discovery requests: (1) all correspondence sent by

3   Plaintiff to Citizens; (2) all documents which Plaintiff contends support any claim raised in the

4   complaint; (3) all contracts between Plaintiff and Citizens; and (4) all payments made by

5   Plaintiff to Citizens.  (Ankcorn Decl. Ex. H.)  Contrary to Plaintiff's contention, those requests

6   do not appear to have given Defendants a "full and complete picture" of his case.  And the fewer

7   than 60 pages of documents produced from these requests is hardly extensive.  In addition to the

8   fact that there were no depositions taken, the discovery conducted in the state action was not so

9   extensive that it prejudices Plaintiff here to the point where he can overcome the heavy burden

10   of proof needed to show waiver.

11       Finally, the record before the Court does not show that Defendants requested arbitration

12   close to the trial date or delayed for a long period of time before seeking a stay.[5]  And though

13   Defendants did file a cross-complaint, it was not substantively related to the TCPA claims that

14   they now seek to arbitrate.  (*See* Ankcorn Decl. Ex. E (alleging causes of action related to the

15   collection of Plaintiff's outstanding balance for his credit card).)

16       In sum, though there is some basis for Plaintiff's contentions that the *Saint Agnes* factors

17   may weigh in his favor, they do not weigh heavily enough to overcome the heavy burden of

18   proof needed to establish that Defendants waived their right to arbitration.  *See Saint Agnes*, 31

19   Cal. 4th at 1196; *see also Park Place*, 563 F.3d at 921.

20

21       **C.    The TCPA Claims Relate to the Agreement.**

22       The "principal purpose" of the FAA is to "ensur[e] that private arbitration agreements are

23   enforced according to their terms."  *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior*

24   *Univ.*, 489 U.S. 468, 478 (1989); *see also Levine v. Advest, Inc.*, 244 Conn. 732, 746 (1998).

25

26       [5] Defendants also substituted counsel in October 2011.  (Ankcorn Decl. ¶ 53.)  Though
    neither party addresses that, the substitution of counsel may justify a reasonable delay to pursue
27   arbitration, especially in light of the fact that the state court continued a hearing two months to
    allow the parties to discuss resolution of their dispute following the substitution of counsel.  (*See*
28   *id.*)

11cv2137

1   Thus, "parties may agree to limit the issues subject to arbitration, to arbitrate according to

2   specific rules, and to limit *with whom* a party will arbitrate disputes." *AT&T Mobility LLC v.*

3   *Concepcion*, — U.S. —, 131 S. Ct. 1740, 1748-49 (2011) (internal citations omitted) (emphasis

4   in original).

5          Plaintiff relies heavily on *In re Jiffy Lube International, Inc., Text Spam Litigation*, 847 F.

6   Supp. 2d 1253 (S.D. Cal. 2012) (Miller, J.), where the district court "denied a motion to compel

7   arbitration of a TCPA claim, notwithstanding the 'incredibly broad' language of the arbitration

8   clause at issue." (Pl.'s Opp'n 12:14–24.)  In *Jiffy Lube*, the plaintiffs filed a class-action

9   complaint alleging that they received unauthorized text messages offering discount Jiffy Lube

10  services in violation of the TCPA. *Jiffy Lube*, 847 F. Supp. 2d at 1255-56.  The arbitration

11  agreement at issue was allegedly signed by a plaintiff when he visited one of the defendant's

12  store locations to receive an oil change. *Id.* at 1262-63.  The court noted that the language of the

13  arbitration agreement was "incredibly broad" because "[i]t purports to apply to 'any and all

14  disputes' between [the parties], and is not limited to disputes arising from or related to the

15  transaction or contract at issue." *Id.* at 1262.  The court concluded that "a suit . . . regarding a

16  tort action arising from a completely separate incident could not be forced into arbitration—such

17  a clause would clearly be unconscionable." *Id.* at 1263.  To elaborate, the court further

18  explained that "[t]hough it seems likely that [the plaintiff] provided his telephone number when

19  signing the contract, it is unclear that later use of that number to commit a tort can be said to

20  relate to the contract . . . the fact that the text message offered membership in a club that would

21  provide discounts on an oil change does not establish that the text message was related to the

22  contract governing [the plaintiff's] oil change." *Id.*

23         The arbitration agreement at issue here is not as broad as the one in *Jiffy Lube*.

24  Arbitration here is limited to "any claim, dispute or controversy of any nature . . . *under or*

25  *related* to any Account [Plaintiff has] with the Bank." (Klos Decl. Ex. A (emphasis added).)

26  The agreement even explicitly covers claims related to "any servicing and collection activity."

27  (*Id.*)  More broadly, Section 29 of the Agreement also discusses consent regarding telephone

28  calls.  Without a doubt, the phone calls to Plaintiff were related to "collection activity," an issue

10

11cv2137

explicitly contemplated by the Agreement.  Plaintiff himself concedes that the phone calls he received were related to the credit card.  (McNamara Decl. ¶ 16 ("I received 22 calls on my cell phone relating to the Ralphs Rewards card.").)  Therefore, Plaintiff's TCPA claims relate to his Agreement with Defendants, and are consequently subject to arbitration.  *See Concepcion*, 131 S. Ct. at 1748-49; *see also Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25 ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration")*; Knutson v. Sirius XM Radio Inc.*, No. 12cv418, 2012 WL 1965337, at *8 (S.D. Cal. May 31, 2012) (Battaglia, J.) (compelling arbitration for TCPA claims).

### D.    Plaintiff Fails to Show that the Arbitration Agreement Is Unconscionable.[6]

"It is clear that questions of contractual validity relating to the unconscionability of the underlying arbitration agreement must be resolved first, as a matter of state law, before compelling arbitration pursuant to the FAA." *Cap Gemini Ernst & Young, U.S., LLC v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003).  "Like other contracts . . . [arbitration agreements] may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Rent-A-Center, West, Inc. v. Jackson*, — U.S. —, 130 S. Ct. 2772, 2776 (2010).

"The classic definition of an unconscionable contract is one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Smith v. Mitsubishi Motors Credit of Am., Inc.*, 247 Conn. 342, 349 (1998).  "Under Connecticut law, the party that raises unconscionability as a defense to the enforcement of any contract typically has the burden of showing that the contract is both procedurally and substantively unconscionable." *D'Antuono v. Serv. Rd. Corp.*, 789 F. Supp. 2d 308, 327 (D. Conn. 2011) (citing *Bender v. Bender*, 292 Conn. 696, 732 (2009)).  "Substantive

---

[6] Plaintiff also argues that the arbitration agreement is illusory because it permits Defendants to unilaterally modify the terms at any time. (Pl.'s Opp'n 18:19–20:26.)  However, he fails to cite any binding legal authority in doing so.  (*See id.*)  Plaintiff does not cite a single case from California or Connecticut at the state or federal level.  Thus, the Court rejects this argument.

11cv2137

1   unconscionability focuses on the 'content of the contract,' as distinguished from procedural

2   unconscionability, which focuses on the 'process by which the allegedly offensive terms found

3   their way into the agreement.'"  *Cheshire Mortg. Serv., Inc. v. Montes*, 223 Conn. 80, 87 n.14

4   (1992).  "In other words, the party usually must show both that there was an absence of

5   meaningful choice on the part of that party, and that the terms of the agreement were

6   unreasonably favorable toward the other party."  *D'Antuono*, 789 F. Supp. 2d at 327.  "In some

7   rare cases, a contractual provision may be so outrageous as to warrant a court's refusal to

8   enforce it based on substantive unconscionability alone."  *Id.* (citing *Hottle v. BDO Seidman

9   LLP*, 268 Conn. 694, 720-21 (2004)).

10

11                **1.     Procedural Unconscionability**

12        "[T]he Connecticut Supreme Court has soundly rejected the notion that provisions in

13   form contracts are procedurally unconscionable whenever the party with greater bargaining

14   power fails to direct the other party's attention to important provisions."  *D'Antuono*, 789 F.

15   Supp. 2d at 329 (citing *Smith*, 247 Conn. at 352).  Moreover, there is no rule in Connecticut that

16   "take it or leave it" contracts are *per se* procedurally unconscionable.  *Id.*

17        Here, Plaintiff argues that the arbitration agreement is procedurally unconscionable for

18   three reasons: (1) the terms of the agreement were only sent to Plaintiff after the credit card had

19   been extended and a balance transfer was completed; (2) the arbitration section is "on the back

20   of a long sheet of paper, in a two-column maze of legal jargon printed at less than 7 point type,"

21   where Defendants made no special effort to call Plaintiff's attention to the arbitration section;

22   and (3) the agreement was offered on a "take it or leave it" basis, with no option to negotiate

23   terms or opt out of the arbitration provision.  (Pl.'s Opp'n 21:19–22:7.)

24        It is unclear what the significance of Plaintiff's first reason is in the context of procedural

25   unconscionability.  Plaintiff fails to explain how or why the first reason supports a finding of

26   procedural unconscionability.  With respect to the remaining reasons, Connecticut law is clear

27   that those grounds are not sufficient to find procedural unconscionability.  *See D'Antuono*, 789

28   F. Supp. 2d at 329; *Smith*, 247 Conn. at 352.  On a final note, Plaintiff fails to provide any law to

11cv2137

1    support his contention that any of these reasons serve as a sufficient basis to show that the

2    arbitration agreement is procedurally unconscionable.  (*See* Pl.'s Opp'n 21:19–22:7.)

3            Therefore, the arbitration agreement as issue here is not procedurally unconscionable

4    under Connecticut law.  *See D'Antuono*, 789 F. Supp. 2d at 329; *Smith*, 247 Conn. at 349.

5

6                    **2.    Substantive Unconscionability**

7            Plaintiff fails to show that the arbitration clause is substantively unconscionable under

8    Connecticut law.  Though it may very well be true that Citizens is entitled to unilateral revision

9    without giving notice, there is no opt-out provision, and the arbitration agreement lacks

10   procedural guidance regarding discovery, Plaintiff fails to cite any cases applying Connecticut

11   law that show any of these reasons amount to substantive unconscionability.  Rather, without

12   much explanation, Plaintiff concludes that "[t]hese terms are so outrageously one-sided that the

13   contract may be held to be unconscionable on the substance of the terms alone, as Connecticut

14   law provides." (Pl.'s Opp'n 22:24–26.)  Though Plaintiff cites one case from the Connecticut

15   Supreme Court, *Hottle*, that case considered whether an arbitration agreement was substantively

16   unconscionable under New York contract law.  *See Hottle*, 268 Conn. at 719-21.  Consequently,

17   insofar as its guidance on the unconscionability defense, *Hottle* does not apply here.

18           Looking to the merits of Plaintiff's argument, Plaintiff fails to show that he entered into

19   an agreement "which no man in his senses, not under delusion, would make . . . and which no

20   fair and honest man would accept." *See Smith*, 247 Conn. at 349.  There is also nothing before

21   the Court that shows the arbitration agreement is so outrageous as to warrant this Court's refusal

22   to enforce it based on substantive unconscionability alone.  *See D'Antuono*, 789 F. Supp. 2d at

23   327.  In light of Connecticut's policy favoring arbitration, the Court cannot conclude that the

24   arbitration agreement is substantively unconscionable under Connecticut law.  *See Waterbury*

25   *Teachers Ass'n v. City of Waterbury*, 164 Conn. 426, 434 (1973).

26   //

27   //

28   //

11cv2137

1    **E.   Kroger Can Compel Arbitration.**

2    "[U]nder both federal and California decisional authority, a nonsignatory defendant may

3    invoke an arbitration clause to compel a signatory plaintiff to arbitrate its claims when the causes

4    of action against the nonsignatory are 'intimately founded in and intertwined' with the

5    underlying contract obligations." *Boucher v. Alliance Title Co., Inc.*, 127 Cal. App. 4th 262, 271

6    (2005); *see also Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006); *Newton v. Am. Debt*

7    *Servs.*, 854 F. Supp. 2d 712, 730-31 (N.D. Cal. 2012). Here, the arbitration provision in the

8    Agreement contemplated the members of the Kroger Personal Finance joint venture—Kroger

9    and RBS—as parties that may resolve disputes in binding arbitration. (*See* Klos Decl. Ex. A.)

10   Therefore, even though Kroger is a nonsignatory to the Agreement, it may bring a motion to

11   compel arbitration under that clause. *See Boucher*, 127 Cal. App. 4th at 271.

12   Plaintiff also challenges RBS' authority to move to compel arbitration. Under the

13   Agreement, RBS' status is identical to Kroger's, thus RBS would also have been able to bring a

14   motion to compel arbitration. However, because RBS has since been dismissed from this action,

15   its authority to move to compel arbitration is moot.

16

17   **IV.   CONCLUSION & ORDER**

18   In light of the foregoing, the Court **GRANTS** Defendants' motion to compel arbitration

19   for all claims asserted in the complaint (Doc. 41), and **DISMISSES WITHOUT PREJUDICE**

20   this action in its entirety whereby the parties may re-file should further proceedings be necessary

21   following the completion of arbitration.

22   **IT IS SO ORDERED.**

23

24   DATED: November 5, 2012

25                                                    M. James Lorenz
                                                      United States District Court Judge

26   COPY TO:
     HON. WILLIAM V. GALLO
27   UNITED STATES MAGISTRATE JUDGE

28   ALL PARTIES/COUNSEL

14

11cv2137